[No. 14211-6-III. Division Three. February 15, 1996.]

DOLORES L. HENDERSON, ET AL., *Appellants*, v. STEVEN D. TYRRELL, *Respondent*.

594

*William R. Hickman,·Marilee C. Erickson*, and *Reed, McClure*, for appellants.

*Richard C. Eymann* and *Feltman, Gebhardt, Eymann & Jones, P.S.*, for respondent.

THOMPSON, J. — Dolores, Daren, and Dwight Henderson appeal rulings made by the court during a trial resulting in a jury finding that Daren Henderson — not Steven Tyrrell — was the driver in a single-car accident. The Hendersons contend they were denied a fair trial by Mr. Tyrrell's destruction of the wrecked car and loss of other evidence. They also contend the trial court erred by admitting hearsay and unsworn testimony.

In addition, Daren Henderson appeals a jury award of $3,694,068 to Mr. Tyrrell. He contends the award was the result of the trial court's failure to permit the jury to allocate fault to a potentially responsible third party, the improper admission of evidence regarding Mr. Tyrrell's brother, and the court's instruction on intervening cause. Daren Henderson also contends the court erred in failing to reduce the amount of the damage award.

We affirm.

Mr. Tyrrell and the Henderson siblings were riding in Mr. Tyrrell's 1972 Camaro on the evening of July 5, 1988, when the car crashed near Medical Lake on Hallet Road. The car was traveling about 75 miles per hour; it rolled and landed upright in a rocky field 190 to 195 feet off the road. Mr. Tyrrell, whom passers-by found lying on the

ground 20 to 35 feet from the wrecked car, was seriously injured and remained in a coma for several days; the Hendersons' injuries were less serious.

The high-performance car was the "love of [Mr. Tyrrell's] life." In the past, he had refused to allow others to drive it. However, the parties disagreed over who was driving the car at the time of the accident.

Mr. Tyrrell testified he drove his car that evening to visit his friend, Dwight Henderson. Dwight lived with his mother, Diane Henderson; his twin sister, Dolores Henderson; and his older brother, Daren Henderson. Mr. Tyrrell lived nearby with his mother, Pamela Stratton. Mr. Tyrrell and the Henderson siblings got into Mr. Tyrrell's car to drive to the town of Medical Lake to rent videotapes. Mr. Tyrrell said he stopped briefly to go into his residence, and when he returned to the car Daren Henderson was sitting in the driver's seat. Daren refused to move, and Mr. Tyrrell finally agreed to let him drive. Mr. Tyrrell testified he got into the front passenger seat, and Dolores and Dwight Henderson were in the back seat.

Mr. Tyrrell testified Daren drove slowly on the unpaved road, but when the car reached the pavement, he "laid the throttle down." The car started fishtailing, and Mr. Tyrrell yelled at Daren to slow down. Mr. Tyrrell's last clear memory was of the car leaving the roadway; he testified he vaguely remembered later feeling "pain in my chest, as if somebody was putting their arms around my chest and pulling me, or lifting me or doing something of that nature."

Mr. Tyrrell presented expert testimony supporting his claim that Daren Henderson was driving the car, and that he, Steven Tyrrell, was pulled from the right front passenger seat after the accident. Dr. William Brady concluded the person in the right front passenger seat would have received the most serious injuries in the accident, and the likelihood of any passenger being thrown from the car during the accident was "close to nil."

Among Mr. Tyrrell's injuries were two collapsed lungs,

a condition commonly caused by a blunt abdominal trauma, such as striking a steering wheel. However, Dr. Brady and another medical expert testified Mr. Tyrrell did not receive a significant blunt abdominal trauma during the accident. Based on his comparison of x-rays taken when Mr. Tyrrell arrived at the hospital with x-rays taken an hour later, Dr. Brady concluded the lungs collapsed after emergency medical personnel created a small tear in Mr. Tyrrell's airway during intubation. He testified the result was an "accepted risk" of emergency treatment, and Mr. Tyrrell was treated appropriately. Dr. Brady testified the emergency personnel "did exactly the right thing. They did a swell job. And they got a perfect result."

The Henderson siblings testified Mr. Tyrrell was driving the car; Dolores was in the front passenger seat; and Daren and Dwight were in the back seat. They said the car did not make any stops after leaving the Henderson residence. After the accident, they said, Dolores was partially hanging from the right front window, and Daren was lying across Dwight's lap, partially hanging from the left front window. They said Mr. Tyrrell was thrown from the car, and they found him several feet away. Dwight received relatively minor injuries; Dolores received cuts and bruises, and injuries to her knees; Daren had a broken scapula and rib, complained of pain in his lower back, and had a swollen right hand and tender spots on his chest and knees.

The Hendersons presented expert testimony indicating Mr. Tyrrell was driving the car. Ralph E. Duncan, an accident reconstruction engineer, concluded Mr. Tyrrell was driving, Dolores Henderson was in the front passenger seat, and Dwight and Daren Henderson were in the back seat. His opinion was based in part on Mr. Tyrrell's chest injury. Dr. Donald Hutchings, a clinical neuropsychologist who treated Mr. Tyrrell for his traumatic brain injury, testified Mr. Tyrrell suffered from retrograde amnesia after the accident. He stated that, although after the accident Mr. Tyrrell consistently said he was not the car's

driver, his memory of the events should not be necessarily considered accurate or valid. Dr. Hutchings testified: "I wouldn't want any truly important decisions to be based . . . solely on his self-report of what took place."

The Hendersons sued Mr. Tyrrell in May 1990, alleging Mr. Tyrrell was the driver. Mr. Tyrrell answered and counterclaimed, alleging Daren Henderson was the driver. The parties agreed to bifurcate the trial as to liability and damages and to first determine the identity of the driver. On July 2, 1993, a jury concluded Daren Henderson was the driver.

Almost a year later, the parties presented evidence to a different jury on the question of damages.[1] Medical evidence showed Mr. Tyrrell suffered broken bones in both legs, his left foot, his pelvis, his right arm, and his collarbone. His shattered left kneecap was removed. Dr. James Conaty, an orthopedic surgeon who treated Mr. Tyrrell through January 1990, testified Mr. Tyrrell's bones were as strong as they had been before the accident, though he might suffer a slight loss of use of his knee because of the missing kneecap.

Dr. Vivian Moise, a physiatrist who began treating Mr. Tyrrell nine days after the accident, concluded Mr. Tyrrell suffered a basilar skull fracture. No other doctor diagnosed such a skull fracture, but at trial all medical experts agreed Mr. Tyrrell suffered a closed head injury or brain injury. Dr. Catherine Mateer, a clinical neuropsychologist who evaluated Mr. Tyrrell before trial, concluded he had suffered a "very severe traumatic brain injury." However, Dr. Lloyd Cripe, a clinical neuropsychologist who evaluated Mr. Tyrrell for the defense, concluded the brain injury resulted in only "mild impairment."

The doctors' most immediate problem with Mr. Tyrrell in emergency was his collapsed lungs. In the damages trial, Dr. Brady repeated his opinion that intubation was

---

[1]After the first trial, the court had realigned the parties to make Mr. Tyrrell the plaintiff.

the likely cause of the collapsed lungs.[2] Based on the hospital's records, he concluded Mr. Tyrrell was intubated before arriving at the hospital, but the tube was removed at the hospital and another tube was inserted. Dr. Brady was unable to explain why this would have been done, and had no opinion as to the standard of care in this situation. However, concluding it was "absolutely vital that an airway be established and maintained to keep Steve alive," Dr. Brady found no basis for concluding there was any negligence in Mr. Tyrrell's care or treatment.

The medical experts appeared to agree the collapsed lungs could have contributed to Mr. Tyrrell's brain impairment. Dr. John Garcia, a surgeon who treated Mr. Tyrrell at the emergency room and was his primary physician for 12 days, testified there was some "difficulty with oxygenation." Based on a positive neurological test performed when Mr. Tyrrell arrived at the hospital, Dr. Moise concluded the later collapse of the lungs and the resulting hypoxia, or low blood-oxygen levels, caused or contributed to Mr. Tyrrell's brain injury. Dr. Brady agreed hypoxia can cause brain injury, and did not disagree with the hypoxia diagnosis in Mr. Tyrrell's case.

Mr. Tyrrell remained in a coma or a near-comatose state for several days after the accident. When Dr. Moise first saw Mr. Tyrrell, he was unresponsive. She initiated neuropsychological therapy to get his brain to "turn on," as well as physical, occupational, and speech therapy. Mr. Tyrrell was in rehabilitation for months, learning to walk, talk, and dress himself. When Mr. Tyrrell was discharged from the hospital on November 18, 1988, his physical skills were near normal, although he had limited flexibility of his right elbow.

But Mr. Tyrrell was not back to normal with his mental or cognitive functioning. Dr. Moise testified:

[H]e was still showing problems with his attention. Ability to

---

[2]Doctors who treated Mr. Tyrrell denied the intubation caused the collapsed lungs. They insisted the condition was caused by an impact during the accident itself.

really focus his mind on something. And not distract himself. His reaction times, and speed of mentally processing information and responding were slow compared to the normal range. At that time he still had a poor awareness of his brain deficits. This is very common, after a brain injury. The part of the brain that has insight and is aware of how the brain is doing, is damaged. So, if you don't know how you are doing, it's hard to compensate for the deficits, sometimes.

He showed impairment of all of the executive functions. That means being able to plan. Organize. Problem solve. Those kinds of activities.

Many of these problems were permanent, particularly the difficulties with higher-level thinking skills. Dr. Moise recommended Mr. Tyrrell receive continuing physical, occupational, and speech therapy, as well as psychological counseling, primarily to make him aware of his problems, and to help him make realistic plans for his life.

Dr. Mateer evaluated Mr. Tyrrell in October 1993, five years after the accident. She testified he still suffered from chronic pain, and had continuing cognitive difficulties, including problems with attention and concentration that would make "new learning" difficult. Dr. Mateer also testified Mr. Tyrrell had experienced "drastic changes in social and emotional functioning." She predicted Mr. Tyrrell would have problems keeping up with information he needs in a job, and he would have trouble keeping jobs.

By contrast, Dr. Cripe testified that while Mr. Tyrrell showed some brain dysfunction, the impairment was mild. He disagreed with Dr. Mateer's conclusion that the executive functions were impaired, and testified Mr. Tyrrell's intellectual abilities put him in the average range. When asked to predict Mr. Tyrrell's employment future, Dr. Cripe testified:

It's — it's a difficult thing to predict. It's a lot of speculation. He — when someone is in this range, that is they're still in the average range, and they have this degree of deficit, normally, they'll be gainfully employed. There — there are

many occupations open to a person who has average intellect. Don't most of us have average intellect? So, what I ended up saying in my report was I think it does create challenges for him. And it pulls down his learning capacity a bit. So he has to work harder. And I don't think that's a positive effect upon his ability to function in life, or the real world, as these are never good injuries. But my reading on it, is that the patients that I have seen with this level of impairment, is that they're gainfully employed, and they pursue occupations commensurate with average intellectual abilities.

After the accident, Mr. Tyrrell resumed his education at Spokane Community College. He testified the classes were difficult for him, and he taped the lectures to review as he drove to and from school. He also worked part-time in the school's computer lab, where he spent most of his time studying. Eventually, he obtained an AA degree in computer integrated manufacturing. He then studied briefly at Arizona State University, but discovered he was "definitely over my head." He returned to the Spokane area, and at the time of the damages trial was living again with his mother.

Mr. Tyrrell's medical expenses totaled $153,400. An economist testifying on his behalf calculated his other economic losses (primarily employment income) at approximately $1 million to $1.4 million. An economist testifying for Mr. Henderson calculated the other economic losses at $190,000. The differences were based primarily on reliance on different assumptions regarding Mr. Tyrrell's employment potential, both before and after the accident.

The jury's verdict included the following amounts:

| | |
|---|---|
| Past economic damages: | $ 200,550 |
| Future economic damages: | $ 993,518 |
| Non-economic damages: | $ 2,500,000 |

The court denied Mr. Henderson's motion for reduction of the award, and this appeal followed.

I

SPOLIATION

We first consider whether the Hendersons were denied a fair trial by Mr. Tyrrell's destruction of the wrecked car, and by the loss or disappearance of other potentially helpful evidence. Soon after the accident, while her son was still in a coma, Pamela Stratton began to suspect that Mr. Tyrrell was not the driver. She asked her other son, Stacey Tyrrell, to scrape blood samples from the car's passenger door. Stacey put the samples in a plastic sandwich bag and gave them to Ms. Stratton at the hospital. Ms. Stratton later asked her father, Glen Gregory, to collect blood samples from the car. Mr. Gregory was unsure whether the substance he collected was actually blood, and did not know what happened to the sample. Ms. Stratton never had the samples tested, and did not know what happened to them.

Several witnesses testified about the whereabouts of shoes after the accident. Ms. Stratton said a hospital employee gave her a sack, which she understood to contain Mr. Tyrrell's shoes; she did not remember what happened to the sack. Stacey Tyrrell said he saw a single shoe resting on the gas pedal after the car was returned to his mother's house. Ron Dehn, a friend of Mr. Tyrrell, said he looked into the car at about the same time, and saw Mr. Tyrrell's shoe inside. No shoes were available for expert analysis or for admission as evidence at trial.

The wrecked car was taken to Mr. Tyrrell's residence a few days after the accident. Dwight Henderson removed several gauges, which he thought Mr. Tyrrell would have wanted to save. Dozens of photographs were taken, many of which were used by experts and admitted as exhibits at trial. Mr. Tyrrell later retained attorney Thomas Kelleher, who also examined the car. On April 28, 1989, the

Hendersons' original attorney, Gary Stenzel, directed a letter to Mr. Kelleher, asking Mr. Tyrrell to "preserve the [car] until further notice." Mr. Tyrrell testified he never saw the letter, and was not told of any agreement to preserve the car. After removing various parts, he had the car salvaged in April 1990, approximately 22 months after the accident.

Before the first trial, the Hendersons moved to dismiss Mr. Tyrrell's counterclaim or to limit the evidence he could present, as a sanction for destroying the evidence. The trial court denied the motion, observing "the real culprit here is the passage of time." The court held there was no pattern of willful destruction, and the car was available for inspection by both sides after the accident.

The Hendersons argue the trial court erred in refusing to dismiss Mr. Tyrrell's counterclaim or exclude evidence offered by Mr. Tyrrell, as sanctions for his destruction of the car, blood samples, and shoes. They also argue the court erred in refusing to instruct the jury on the issue of spoliation of evidence.

■■ A trial court's decisions regarding sanctions for discovery violations and admission or rejection of evidence are discretionary, and will not be disturbed on appeal absent a showing of abuse of discretion. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 283, 840 P.2d 860 (1992); *Hampson v. Ramer*, 47 Wn. App. 806, 813, 737 P.2d 298 (1987). *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).

## A. Dismissal or Other Sanction

Destruction or loss of potentially relevant evidence is a long-standing problem, but it has attracted increased attention in the past decade. Scott S. Katz and Anne M. Muscaro, *Spoilage of Evidence — Crimes, Sanctions, Inferences, and Torts*, 29 Tort & Ins. L.J. 51 (1993) (hereafter Katz & Muscaro); *see, e.g.,* Kenneth R. Lang et al., *Spoliation of Evidence: The Continuing Search For a Remedy*

*and Implications For Aviation Accident Investigations*, 60 J. Air L. & Com. 997 (1995) (hereafter Lang). The focus of recent debate is on the appropriate remedy, rather than on what acts constitute spoliation. *See, e.g.*, James F. Thompson, *Spoliation of Evidence: A Troubling New Tort*, 37 U. Kan. L. Rev. 563 (1989). The judicial response to the problem in other jurisdictions seems to reflect an understanding that the term encompasses a broad range of acts, and the severity of a particular act (in terms of the relevance or importance of the missing evidence or of the culpability of the actor) determines the appropriate remedy.

■ Spoliation is defined simply as "[t]he intentional destruction of evidence." BLACK's LAW DICTIONARY 1401 (6th ed. 1990). Some recent cases have attempted more specific definitions, reflecting disagreement over whether the act must have been accomplished during the pendency of an action, by a party to the action. *See* Katz & Muscaro, *supra*, at 52.

The problem historically has been treated as an evidentiary matter; the common remedy is an inference "that the adversary's conduct may be considered generally as tending to corroborate the proponent's case and to discredit that of the adversary." 2 John W. Strong, *McCormick on Evidence* § 265, at 192 (4th ed. 1992) (hereafter McCormick); *see* Katz & Muscaro, *supra*, at 60. A more recent development is the application of a rebuttable presumption, shifting the burden of proof to a party who destroys, alters, or loses important evidence. *See, e.g.*, *Sweet v. Sisters of Providence*, 895 P.2d 484, 490-91 (Alaska 1995).

Another recent response is to treat spoliation as a civil discovery violation, the remedy for which is a sanction provided by Fed. R. Civ. P. 37 (or its state counterpart) or by the courts' inherent power to control litigation. Lang, *supra*, at 1001; Katz & Muscaro, *supra*, at 54; *see, e.g.*, *Shepherd v. American Broadcasting Cos.*, 62 F.3d 1469,

1474-75 (D.C. Cir. 1995); *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 266-67 (8th Cir. 1993).[3]

■ In any case, for a direct sanction to apply the spoliation must in some way be connected to the party against whom the sanction is directed. *See* McCormick, *supra*, § 265, at 191 ("[T]he acts . . . must be connected to the party . . . ."). Here, there is no evidence Mr. Tyrrell was responsible for (or even knew about) the loss of the blood samples or the missing shoes. The trial court was correct in refusing to apply any sanction against him for those actions. The only serious question is whether the court erred in refusing to impose a sanction for or instruct the jury regarding Mr. Tyrrell's destruction of his 1972 Camaro.

■ Of the few Washington cases[4] that address the problem, the most prominent is *Pier 67, Inc. v. King County*, 89 Wn.2d 379, 573 P.2d 2 (1977). The county had not preserved records to explain its valuation techniques, even though it was on notice, through the lawsuit, that the corporation was challenging the assessment. *Pier 67*, 89 Wn.2d at 384-85. The Supreme Court held:

> We have previously held on several occasions that where relevant evidence which would properly be a part of a case is within the control of a party whose interests it would naturally be to produce it and he fails to do so, without satisfactory explanation, the only inference which the finder of fact may draw is that such evidence would be unfavorable to him. In so holding, we have noted, " '[t]his rule is uniformly

---

[3]Other approaches involve remedies that may be applied outside the pending litigation, and therefore are not applicable here. They are imposition of criminal sanctions, *see, e.g.*, RCW 9A.72.150, and recognition of a separate tort of intentional or negligent spoliation, *see, e.g.*, *Williams v. State*, 34 Cal. 3d-18, 664 P.2d 137, 192 Cal. Rptr. 233 (1983). *See Willard v. Caterpillar, Inc.*, 40 Cal. App. 4th 892, 48 Cal. Rptr. 2d 607 (1995); Thomas G. Fischer, Annotation, *Intentional Spoliation of Evidence, Interfering With Prospective Civil Action, as Actionable*, 70 A.L.R.4th 984 (1989). Katz & Muscaro, *supra*, at 53-54, 61-72.

[4]The Hendersons direct our attention to *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 342, 858 P.2d 1054 (1993), which required "a spirit of cooperation and forthrightness during the discovery process . . . for the proper functioning of modern trials . . . ." *Fisons* does not address the question of destruction of evidence, and is not directly applicable here.

applied by the courts and is an integral part of our jurisprudence.' " *British Columbia Breweries (1918) Ltd. v. King County*, 17 Wn.2d 437, 455, 135 P.2d 870 (1943) (quoting with approval 20 Am. Jur. § 183, at 188). *See Bengston v. Shain*, 42 Wn.2d 404, 255 P.2d 892 (1953); *Krieger v. McLaughlin*, 50 Wn.2d 461, 313 P.2d 361 (1957).

*Pier 67*, 89 Wn.2d at 385-86; *see Lynott v. National Union Fire Ins. Co.*, 123 Wn.2d 678, 871 P.2d 146 (1994).

Subsequent cases have not clarified what "satisfactory explanation" will avoid the *Pier 67* inference. Nevertheless, the phrase certainly anticipates circumstances in which a party's actions are not so serious as to require a judicial remedy. In deciding whether to apply a rebuttable presumption in spoliation cases, the Alaska Supreme Court examined two general factors: (1) the potential importance or relevance of the missing evidence; and (2) the culpability or fault of the adverse party. *Sweet*, 895 P.2d at 491; *see Baliotis v. McNeil*, 870 F. Supp. 1285, 1289-93 (M.D. Pa. 1994) (balancing plaintiffs' fault with prejudice to defendants in destruction of evidence). We will address these factors in some detail.

1. Importance of the Car

■ Whether the missing evidence is important or relevant obviously depends on the particular circumstances of the case. *See Sweet*, 895 P.2d at 491; *see also Shepherd*, 62 F.3d at 1479 (altered document would not have provided direct evidence of claim). Another important consideration is whether the loss or destruction of the evidence has resulted in an investigative advantage for one party over another, or whether the adverse party was afforded an adequate opportunity to examine the evidence. *See, e.g., Allstate Ins. Co. v. Sunbeam Corp.*, 53 F.3d 804 (7th Cir. 1995) (Insurance company's investigators destroyed parts of gas grill before defendant's investigators could inspect it.); *Dillon*, 986 F.2d at 263 (Plaintiffs retained three experts to examine car, which then was destroyed before defendants' experts could examine it.); *American Family Ins. Co. v. Village Pontiac-GMC, Inc.*, 223 Ill. App. 3d 624, 585

N.E.2d 1115 (1992) (Plaintiff's expert examined car that allegedly caused home fire; car was destroyed before defense expert was able to inspect it.); *Graves v. Daley*, 172 Ill. App. 3d 35, 526 N.E.2d 679 (1988) (Insurance company — real party in interest — authorized destruction of furnace after its experts inspected it, but before defendants could inspect it in investigation of fire.); *Fire Ins. Exch. v. Zenith Radio Corp.*, 103 Nev. 648, 747 P.2d 911 (1987) (Insurance company's expert determined television was cause of fire, but authorized destruction before filing complaint.).

In this case, the investigative value of Mr. Tyrrell's car was not clear. Mr. Duncan, an accident reconstruction engineer, testified it is normal to have the car available in reconstructing accidents, and it would have been helpful in this case. Carol Murren, a forensic scientist who specializes in analyzing trace evidence, testified blood from the car would have been helpful in identifying the driver. However, she testified blood degrades quickly unless it is stored properly. It is doubtful that blood remaining on the car after several years would have been useful. Nevertheless, as the Hendersons point out, even Mr. Tyrrell's experts believed the car was important enough that they examined a similar car as part of their investigations.

On the other hand, Dr. Dennis H. Parr, a consulting engineer, testified that, while the actual vehicle would have provided a better understanding of how the injuries occurred, other physical evidence would have been even more important. He testified the many photographs documented the physical condition of the car extremely well.[5] Dr. Parr said it is not unusual for an owner to retain a wrecked car for a period, then get rid of it.

Significantly, neither party presented testimony of experts who had examined the car *before* its destruction. Also, both parties had the opportunity to retain experts to inspect the car during the two years after the accident.

---

[5]Over 65 photographs of the damaged vehicle were admitted into evidence.

These facts, combined with the questionable investigative value of the car itself and the many photographs available to the experts,[6] support the trial court's decision.

## 2. Mr. Tyrrell's Culpability

■ In examining culpability, many courts examine whether the party acted in bad faith or conscious disregard of the importance of the evidence, or whether there was some innocent explanation for the destruction. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("[T]he inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction."); *Shepherd*, 62 F.3d at 1481 ("A sanction for failure to preserve evidence is appropriate only when a party has consciously disregarded its obligation to do so."); *Glover*, 6 F.3d at 1329 ("[S]imple notice of 'potential relevance to the litigation' " may justify jury instruction.); *DeLaughter v. Lawrence County Hosp.*, 601 So. 2d 818, 821 (Miss. 1992) ("[W]here the evidence is positive that the hospital had been destroyed by fire, such circumstance would adequately account for the loss of the original medical record without fault attributable to the hospital . . . ."). *See generally Keller v. United States*, 58 F.3d 1194, 1197 n.6 (7th Cir. 1995). The reason for this derives from the evidentiary inference that spoliation creates; unless there was bad faith, there is no basis for "the inference of consciousness of a weak cause." McCormick, *supra*, § 265, at 191. Here, there is no evidence Mr. Tyrrell acted in bad faith in destroying the car. His undisputed testimony was that he got rid of it, two years after the accident, because it

---

[6]The Hendersons rely on *Dillon*, 986 F.2d at 268, for the proposition that photographs are not an adequate substitute for the car itself. In that case, the court noted that the "photographs are not comprehensive, that they fail to document the condition of the interior of the vehicle after the accident, they are grainy and blurred, and in many instances, fail to properly document crucial areas of the vehicle." *Dillon*, 986 F.2d at 268. *See Baliotis*, 870 F. Supp. at 1292 ("[S]poliation inference" warranted in part because "experts failed to photograph all relevant evidence and . . . the photographs are often of poor quality."). Here, by contrast, Dr. Parr testified the photos documented the physical condition of the car extremely well.

reminded him and his mother of the crash. As Dr. Parr testified:

> I mean — who wants — a wrecked vehicle in their front yard for five years. Or who wants to pay for it to put in somebody else's, you know, official storage. If there's no need for it.

Another important consideration is whether the actor violated a duty to preserve the evidence. In *Simich v. Culjak*, 27 Wn.2d 403, 408, 178 P.2d 336 (1947), the defendant violated his duty as a managing partner to "render complete and accurate accounts of all of the partnership business." Because the defendant was unable to give a reasonable explanation of the failure, he was precluded from sharing in the partnership assets. *Simich*, 27 Wn.2d at 410; *see also Bingham v. Keylor*, 25 Wash. 156, 64 P. 942 (1901). Similarly, several decisions from other jurisdictions were based at least in part on the fact that loss or destruction of medical records violated legal or hospital requirements. *Carr v. St. Paul Fire & Marine Ins. Co.*, 384 F. Supp. 821, 831 (W.D. Ark. 1974); *DeLaughter*, 601 So. 2d at 821.

Here, the Hendersons have not established Mr. Tyrrell had any similar duty to retain the 1972 Camaro. Rather, they rely on their attorney's letter to Mr. Tyrrell's attorney, asking Mr. Tyrrell to "preserve the [car] until further notice." In *Hampson v. Ramer*, 47 Wn. App. 806, 737 P.2d 298 (1987), the plaintiff sued for injuries related to a car accident. During discovery, a doctor revealed the plaintiff suffered from carpal tunnel syndrome of the wrist, and would require additional surgery. *Hampson*, 47 Wn. App. at 807. Defense counsel requested that he be informed of further treatment before the treatment was given, but the plaintiff underwent corrective surgery without either counsel's knowledge. *Hampson*, 47 Wn. App. at 808. Even though the plaintiff argued he did not know of defense counsel's request, the court held him responsible for the violation, which precluded defense discovery of the presurgical condition. *Hampson*, 47 Wn.

App. at 812; *see also Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 281 (8th Cir.) (Plaintiff, through her attorneys, failed to preserve evidence.), *cert. denied*, 116 S. Ct. 84 (1995).

█ Similarly here, even though Mr. Tyrrell testified he was unaware of defense counsel's request that the car be preserved, he can be charged with knowledge through his attorney.[7] Nevertheless, *Hampson* is distinguishable. In *Hampson*, the violation prejudiced the defense by depriving it of any opportunity to examine the plaintiff's wrist; the plaintiff was the only party able to discover his pre-surgery condition. Here, by contrast, Mr. Tyrrell waited almost two years before destroying the car, and a full year after defense counsel requested that it be preserved. The Hendersons had ample opportunity during that period to examine the car, and there is no evidence to suggest Mr. Tyrrell prevented them from doing so.

Given the difficulty and potential expense of storing evidence as large as a car, and in light of Mr. Tyrrell's explanation that the car reminded him of the accident, the trial court reasonably concluded the "real culprit here was the passage of time." The Hendersons had ample opportunity to obtain the evidence they now claim was essential to their case. Mr. Tyrrell should not bear the burden of their failure to do so. The trial court did not abuse its discretion by refusing to dismiss the case or limit Mr. Tyrrell's evidence at trial.

## B. Jury Instruction

The Hendersons also contend the trial court erred in re-

---

[7]The Hendersons' attorney was precluded from communicating his request directly to Mr. Tyrrell. RPC 4.2. Mr. Tyrrell argues *Hampson* is distinguishable because it involved a discovery violation during pending litigation, while in this case the lawsuit had not yet been filed. However, the parties and their attorneys certainly were *aware* that litigation was anticipated. In other circumstances, a party's disregard of an opposing party's informal request could be viewed as an indication of bad faith. *See Fire Ins. Exch.*, 747 P.2d at 913-14 ("[E]ven where an action has not been commenced and there is only a potential for litigation, the litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.").

fusing to instruct jurors they were entitled to draw a negative inference from Mr. Tyrrell's destruction of evidence.[8] They proposed the following instruction:

> When evidence is within the control of a party whose natural interests it would be to produce that evidence, and that party destroys the evidence without adequate cause, it may be inferred that such evidence would be unfavorable to that party. A party has control of evidence when the evidence is in the actual physical custody of the party.

The court refused to give the instruction, holding both sides were free to argue the matter as a question of credibility.

 A trial court's decision whether to give a requested jury instruction is discretionary. *Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 617, 707 P.2d 685 (1985). A party is entitled to have its theory of the case set forth in jury instructions, but the trial court has considerable discretion in determining whether instructions are necessary. *Id.* at 617. Instructions are proper if, when read as a whole, they permit both parties to argue their theories of the case, are not misleading, and properly inform the jury of the law. *Id.* at 617. An instruction is required only if there is substantial evidence to support it. *Klein v. R.D. Werner Co.*, 98 Wn.2d 316, 318-19, 654 P.2d 94 (1982).

The Supreme Court Committee on Jury Instructions recommends a trial court not instruct a jury on a party's "failure to produce evidence or a witness." WPI 5.01. The recommendation is based in part on the Supreme Court's rationale in a case in which a party failed to produce several witnesses:

> In not every case where a party to an action has failed to

---

[8]The Hendersons also argue the trial court should have applied a rebuttable presumption, shifting the burden of proof to Mr. Tyrrell, as the Alaska Supreme Court did in *Sweet*, 895 P.2d at 490-92. They failed to raise this issue before the trial court, and it need not be considered here. RAP 2.5(a); *Berg v. Ting*, 125 Wn.2d 544, 555-56, 886 P.2d 564 (1995). The authority for such an argument was available at the time. *Welsh v. United States*, 844 F.2d 1239 (6th Cir. 1988); *Public Health Trust v. Valcin*, 507 So. 2d 596 (Fla. 1987).

produce a witness or witnesses under his control, who could have testified to material facts favorable to such party, and has failed to explain his failure so to do, can it be inferred that the testimony of such witness or witnesses, if produced, would have been unfavorable to such party, but a court or jury may draw such inference only when under all the circumstances of the case the failure to produce such witness or witnesses, unexplained, creates a suspicion that the failure to produce was a willful attempt to withhold competent testimony.

*Wright v. Safeway Stores, Inc.*, 7 Wn.2d 341, 352, 109 P.2d 542, 135 A.L.R. 1367 (1941). The Hendersons point out that the cases on which the committee's recommendation is based involve failure to call witnesses, rather than failure to produce physical evidence. *See* WPI 5.01 cmt. While it may be true, as the Hendersons argue, that failure to produce physical evidence is different from failure to produce witnesses, the trial court reasonably concluded in this case that Mr. Tyrrell had satisfactorily explained his destruction of the 1972 Camaro.[9]

The Hendersons' proposed instruction was not supported by the evidence, and unfairly would have created the suspicion that Mr. Tyrrell had willfully attempted to deny jurors access to adverse evidence. The trial court did not abuse its discretion in refusing the proposed instruction.

## II

### Lapan Testimony

At the first trial, Mr. Tyrrell presented the videotaped testimony of Greg Lapan, a Henderson family friend who arrived at the scene just after the accident. Although his memory of the event was cloudy, Mr. Lapan testified he remembered hearing Daren Henderson admit he was driv-

---

[9]The Hendersons' reliance on *Wood v. Miller*, 147 Wash. 251, 265 P. 727 (1928) is misplaced. *Wood* did not hold an inference instruction is required; it held merely that any such instruction must "indicate clearly to the jury that they might consider such collateral matter only in determining whether the party's cause lacked honesty and truth." *Wood*, 147 Wash. at 256.

ing the car, and saying "I've killed him. I've killed him." The Hendersons moved to exclude the testimony, based on Mr. Lapan's refusal to "swear" to the events. Mr. Lapan testified:

Q [by Mr. Goss] All right. Mr. Lapan, I have a few questions for you.

At the time that we previously spoke during the telephone deposition, I understood that there were many things about the events of July 5, 1988, that were very vague in your memory. Am I correct about that?

A You're correct, sir.

Q And you indicated several times that you were not able to swear to what you saw or heard that night; is that correct? Well, was that what you told us during the deposition, Mr. Lapan?

A I thought I had told you that, sir —

Q All right.

A — that I — I won't put it in Mr. Kappelman's words, but I'll put it in mine. To the best of my recollection, I will tell you everything that I remember after — since these past five years. I cannot swear to each and every word. But to the best of my recollection, I will do the best I can for either of you gentlemen.

Q All right. In fact, I think you told us, did you not, that you weren't able to swear to the conversation that you overheard with Mr. Daren Henderson; am I correct?

A That is correct, sir. Or to who initiated the conversation or anything like that.

. . . .

Q All right. Now, you indicated for us that you had overheard somebody — some unidentified person talking to Mr. Daren Henderson and asked him who was driving; is that correct?

A Yes, sir.

Q Was this a man or a woman who was talking to him?

A I have no idea whether it was a man or woman, sir. It could have been a patrolman. It could have been a civilian. I have no idea.

Q Do you know if this was a young person or an old person?

A No, sir, I don't.

. . . .

Q Did you see [Dwight Henderson] there?

A Toward the end, yes, sir. He was with his mom.

Q When I asked you that question on April 1st, the question at page 36 beginning at line 11 was: "Do you recall seeing Dwight Henderson at the scene of the accident?" Your answer at that time was: "Not — not — I do not remember him being there. He may have come back with his mother, but I do not remember." Is that —

A Better choice of words, sir.

Q All right.

A He may have come back with his mother. I cannot swear that he was there.

Q Okay. Do you have any independent recollection of Dwight Henderson actually coming back to the scene having been seen by you?

A No, sir, not that I can swear or affirm to.

. . . .

A Mr. Goss, Mr. Kappelman, I'm here, to help you both and I'm giving you to the best of my knowledge, best of my recollection, everything that I remember. I am not able to swear in a court of law that everything I have said is the complete facts.

Q All right. I appreciate that, sir. You understand what I'm trying to do. I'm trying to —

A I know, sir.

Q — to sort out what information you may have seen and what information you may have heard on the night of

the accident versus what you may have heard or what you may have seen or may have come to your knowledge in some way at some later time. Can you appreciate what I'm trying to do?

A I understand, sir.

Q All right.

A If I could, though, you say at a later time, no one, as far as I know, other than the praying for Mr. Tyrrell and the checking on the condition of the Henderson children at church, I have not been contacted nor have I discussed this particular accident with anybody. So up until July 5th, I thought everything was resolved. I didn't think there was any problems.

The trial court denied the motion to exclude Mr. Lapan's testimony, holding he did not renounce his oath, but merely was expressing his uncertainty about some of the events.

The Hendersons argue Mr. Lapan's testimony was unsworn, and should not have been admitted.[10] They rely on *State v. Hunter*, 183 Wash. 143, 48 P.2d 262 (1935) and *State v. Smails*, 63 Wash. 172, 115 P. 82 (1911), which do not support their position.

In *Smails*, a witness testified as follows:

Q What do you say now as to whether that mortgage was written for two hundred and fifty dollars or twenty-two hundred and fifty dollars.

A *I could not swear as to either, whether it was two hundred and fifty or twenty-two hundred and fifty.*

Q You got no impression as to the amount of the mortgage from the examination you made?

---

[10]The Hendersons also argue Mr. Lapan lacked personal knowledge. *See* ER 602. Mr. Lapan was testifying to events he personally observed, and the testimony was not inadmissible on this basis. *See* 5A Karl B. Tegland, Washington Practice, *Evidence* § 218, at 152 (3d ed. 1989). The Hendersons also argue Mr. Lapan's testimony violated ER 603, requiring witnesses to declare they will testify truthfully, by oath or affirmation. However, the record indicates Mr. Lapan was "duly sworn on oath" before his testimony.

*Smails*, 63 Wash. at 184. The trial court sustained an objection, and the Supreme Court affirmed, holding "it is plain that any answer the witness could have made to this would have thrown no light upon the question at issue." *Id.* at 184.

In *Hunter*, a witness, asked about the details of an accident, responded, "Well, I couldn't swear to it." Counsel then asked, "What is your best judgment on it." The Supreme Court held the " 'best judgment' of the witness, under the circumstances disclosed by the record, would not be material." *Hunter*, 183 Wash. at 162.

██ Both *Smails* and *Hunter* indicate a witness's response that he is unable to "swear" to a fact is tantamount to saying the witness does not know the answer to the question. Neither case suggests a response such as "I can't swear to it" invalidates the entire substance of a witness's testimony. Indeed, in both *Smails* and *Hunter*, the witnesses' remaining statements understandably were treated as proper.

In this case, Mr. Lapan clearly was unsure about various details, and he expressed his uncertainty by refusing to be pinned down. *See United States v. Tipton*, 964 F.2d 650, 655 (7th Cir. 1992) (Witness's uncertainty was "the kind of statement we might expect from a truthful witness who wants to be careful to tell the whole truth and nothing but the truth."); *see generally* 5A Karl B. Tegland, Washington Practice, *Evidence* § 218(4), at 155-56 (3d ed. 1989). But Mr. Lapan was prepared to testify to those details that he did remember. Mr. Lapan's testimony as to the events he remembered was relevant and material; the trial court did not abuse its discretion in admitting it.

## III

### GREGORY TESTIMONY

Immediately after the accident, Dwight Henderson ran to the nearby home of Sandra Flood. Ms. Flood testified she asked Dwight if anyone was still in the car, and Dwight responded, "[N]o, we got them out."

Early the next day, Dwight Henderson visited the home of Glen Gregory to tell him Mr. Tyrrell, Mr. Gregory's grandson, had been seriously injured. Mr. Gregory was asked during a videotaped deposition about discrepancies between what he heard that morning from Dwight Henderson and what he heard Dwight Henderson had told Sandra Flood the night before:

Q What was the discrepancy between what Dwight Henderson told you, that morning at 6:00 a.m. and what Dwight Henderson told someone else? Can you describe the discrepancy between the two stories that you say led you to believe that Steve was not the driver of the vehicle?

I'll ask you this: You heard another version of the events of that night from Pam Stratton?

A Yeah, that came from this —

Q Mrs. Flood?

A — Mrs. Flood.

Q Okay. What I want to you [sic] do is, without getting into the facts and — getting into the Sandy Flood version, I want you to tell me what the discrepancy was between the version that Dwight gave you and the other story. What was the difference?

. . . .

A . . . Oh, what Dwight told me, that when the car came to rest, Steven wasn't in the car. So he told his brother and his sister . . . to look for Steven, and he run up the hill to this Flood's place.

Q That's what he told you?

A Yeah. Now, about a couple weeks later, I get another story that Mrs. Flood told my daughter, that when Dwight came up there, he said that they had a wreck down at the — in the field, and Steven is injured real bad and he might even be dead.

And before that — I got ahead some, but before he said

that to her, he said that he got all the people out of the car. There was nobody left in the car, because he was afraid it would catch on fire. And then he told her that Steven was hurt real bad, and he might even be dead. And at that time Dwight had blood all over his chest here and he never got hurt. So when he drug, — I can't tell you that, because you say I can't tell that kind of stuff.

Q Well, when he came to your house that morning, did he have —

A No.

Q — any blood all over his chest?

A No, he had clean clothes on.

Q Does that synopsize what you believe is the discrepancy between what he told you that morning and what he told someone else?

A Yeah. Well, he told me that Steve got throwed out of the car, and he told the other people that Steve — that he took Steve out of the car. He helped take Steve out of the car, and that's where I figured he got all of that blood.

Before trial, the Hendersons moved to exclude as hearsay the portions of the videotaped testimony in which Mr. Gregory testified to what his daughter, Pamela Stratton, told him she had heard from Sandra Flood. The trial court allowed the testimony, holding the statements were offered not to prove their truth, but rather to explain why Mr. Gregory began to suspect Mr. Tyrrell was not the car's driver. The court also noted the Hendersons were not prejudiced, because the statements were consistent with the anticipated testimony of Ms. Flood.

The Hendersons argue Mr. Gregory's testimony was prejudicial, multiple hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Here, portions of Mr.

Gregory's testimony, repeating prior statements of Dwight Henderson and Ms. Flood (related through Ms. Stratton), were inadmissible hearsay unless offered for some reason other than to prove their truth.

■ Out-of-court statements offered to show their effect on the listener, regardless of their truth, are not hearsay. *Patterson v. Kennewick Pub. Hosp. Dist. 1*, 57 Wn. App. 739, 744, 790 P.2d 195 (1990) (citing 5B Karl B. Tegland, Washington Practice, *Evidence* § 336, at 34 (3d ed. 1989)). To be admissible on this basis, however, the listener's state of mind must be relevant to some material fact. *State v. Parr*, 93 Wn.2d 95, 98-104, 606 P.2d 263 (1980); *CHG Int'l, Inc. v. Robin Lee, Inc.*, 35 Wn. App. 512, 516, 667 P.2d 1127, *review denied*, 100 Wn.2d 1029 (1983).

Here, Mr. Tyrrell argues the testimony was offered to explain the statements' effect on Mr. Gregory's state of mind, and the questioning reflects that focus. However, the relevance of Mr. Gregory's state of mind is not apparent. The sole issue in the trial was the identity of the car's driver. The out-of-court statements were relevant to that issue only if considered for their truth. *See CHG Int'l*, 35 Wn. App. at 516. The trial court should not have admitted this portion of Mr. Gregory's testimony.

■ However, reversal is required only if there is a substantial likelihood the error affected the jury's verdict. *Carnation Co. v. Hill*, 115 Wn.2d 184, 186, 796 P.2d 416 (1990). Three hearsay statements by Mr. Gregory are at issue:

1. Dwight Henderson had blood "all over his chest." Ms. Flood testified Dwight had blood on his hands, and "[m]aybe on his clothing." However, on cross-examination, Ms. Flood testified she did not recall seeing blood on Dwight's clothes. Ms. Stratton testified she saw blood on Dwight's T-shirt at the accident scene. This statement by Mr. Gregory, although inconsistent with some of the testimony, was consistent with other evidence, and was not prejudicial.

2. Dwight Henderson said "that he got all the people

out of the car." This statement is almost identical to Ms. Flood's testimony that Dwight told her, when she asked if anyone was still in the car, "[N]o, we got them out." The statement was not prejudicial.

3. Dwight Henderson said "he took Steve out of the car. He helped take Steve out of the car." As the Hendersons point out, no other witness confirmed this statement, which apparently was an inference Mr. Gregory drew from Dwight's statement to Ms. Flood that "we got them out."

The crucial question, then, is whether this third hearsay statement, unconfirmed by other testimony, had a substantial likelihood of affecting the jury's verdict. Under the circumstances, we conclude it did not. Mr. Gregory made the statement immediately after accurately quoting Ms. Flood's version of what Dwight Henderson had told her. Mr. Gregory was clearly summarizing his own understanding of the statement. In that context, and in light of Ms. Flood's clear recollection of what Dwight told her, jurors almost certainly understood Mr. Gregory's statement as his own inference. There is no substantial likelihood the hearsay affected the verdict, and the error was harmless.[11]

## IV
### NONPARTY FAULT

Before the second trial, Mr. Tyrrell moved in limine to exclude evidence of fault of a nonparty. The motion apparently was directed at an expected attempt by Mr. Henderson to shift the blame to emergency medical personnel or the hospital for intubating Mr. Tyrrell, thereby causing the collapsed lungs and possibly the brain injury. The trial court, noting Mr. Henderson had failed to raise the issue as an affirmative defense in any respon-

---

[11]The Hendersons argue that Mr. Gregory's hearsay testimony, along with Mr. Tyrrell's "vague recollection of being lifted," were the only evidence Mr. Tyrrell was not ejected from the car. This argument ignores various expert opinions that Mr. Tyrrell was not the driver. Also, Dr. Brady testified the likelihood of any passenger being thrown from the car during the accident was "close to nil."

sive pleading, held the jury would not be instructed on nonparty fault. However, the court recognized that if the trial had not been bifurcated, the jury would have heard Dr. Brady's testimony explaining the cause of the collapsed lungs; as a matter of fairness, the court held Mr. Henderson would be permitted to present evidence of the cause of the lung collapse, and the jury would be instructed on the issue of intervening cause.

In the second trial, Dr. Brady essentially repeated his opinion that the collapsed lungs were the result of the intubation process at the emergency room. He also testified that, based on the hospital records, it appeared emergency room personnel had removed the original tube and inserted a different tube. Over objection,[12] Dr. Brady testified generally about the importance of establishing an airway, and concluded there was no negligence by the emergency medical personnel. However, Dr. Brady had no opinion regarding the standard of care in replacing the tube.

Mr. Henderson then offered the rebuttal testimony of Dr. Tony Appel, who would have testified as to the standard of care of hospital emergency room staff in removing and reinserting the tube. He also would have testified it was "sheer arrogance" of hospital personnel to replace the tube, and a tear or perforation in the windpipe or lungs was not an acceptable or foreseeable risk of intubation. The court rejected Dr. Appel's testimony, holding the standard of care was irrelevant to the jury's determination whether the intubation was a superseding intervening cause.

RCW 4.22.070(1) requires that, "[i]n all actions involving fault of more than one entity, the trier of fact shall determine the percentage of the total fault which is at-

---

[12]Mr. Henderson objected that Dr. Brady, a pathologist, was not qualified on the standard of care in hospital emergency rooms. Dr. Brady testified on voir dire that he had not practiced in an emergency room for more than 30 years, but that his work as a pathologist gave him an understanding of the standard of care. The court permitted the testimony, holding the objection went to the weight of Dr. Brady's opinion, not its admissibility.

tributable to every entity which caused the claimant's damages . . . ." The statute "establishes several liability as the general rule, but retains joint and several liability under a limited number of circumstances, one of which applies when a fault-free claimant is injured."[13] *Anderson v. City of Seattle*, 123 Wn.2d 847, 850, 873 P.2d 489 (1994); *see* RCW 4.22.070(1)(b).

■ However, the statute is not self-executing; it requires a party seeking allocation to invoke its procedure. *Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 25, 864 P.2d 921 (1993). CR 8(c) includes "fault of a nonparty" as one of the affirmative defenses that a party is required to set forth in a responsive pleading. Also, CR 12(i) provides:

> Whenever a defendant or a third party defendant intends to claim for purposes of RCW 4.22.070(1) that a nonparty is at fault, such claim is an affirmative defense which shall be affirmatively pleaded by the party making the claim. The identity of any nonparty claimed to be at fault, if known to the party making the claim, shall also be affirmatively pleaded.[14]

■ Here, Mr. Henderson did not affirmatively plead nonparty fault, and the trial court excluded the evidence on that basis. However, Mr. Henderson argues the trial court should have applied the pleading rules flexibly, allowing him to present Dr. Appel's testimony. He argues

---

[13]Arguably, in light of the jury's verdict in the first trial, Mr. Tyrrell is a fault-free claimant; Mr. Henderson does not argue Mr. Tyrrell could be at fault if he were not the car's driver. Therefore, Mr. Tyrrell suggests, based on RCW 4.22.070(1)(b), that Mr. Henderson would be jointly and severally liable with any other potentially responsible entity. Whether Mr. Henderson is entitled to contribution from other entities in this circumstance is not an issue in this appeal.

[14]CR 8(c) was amended and CR 12(i) was added effective September 18, 1992, while this case was pending. *See* Adoptions and Amendments of Rules of Court, 119 Wn.2d 1254, 1257-58 (1992). The rules apply to "all proceedings in actions after they take effect, and also all further proceedings in actions pending on their effective dates, except to the extent that in the opinion of the superior court, expressed by its order, the application of rules in a particular action pending when the rules take effect would not be feasible or would work injustice, in which event the procedure existing at the time the action was brought applies." CR 86.

Mr. Tyrrell himself opened the issue in both trials by presenting Dr. Brady's opinion that the intubation process caused Mr. Tyrrell's collapsed lungs, and particularly during the second trial when Dr. Brady concluded there was no evidence of hospital negligence. Mr. Henderson contends the trial court's exclusion of evidence of hospital fault denied him the right to a jury trial pursuant to Const. art. I, § 21.

■ "Generally, affirmative defenses are waived unless they are (1) affirmatively pleaded, (2) asserted in a motion under CR 12(b), or (3) tried by the express or implied consent of the parties." *Bernsen v. Big Bend Elec. Coop.*, 68 Wn. App. 427, 433-34, 842 P.2d 1047 (1993). However, in light of the rule's policy to avoid surprise, affirmative pleading sometimes is not required:

> It is to avoid surprise that certain defenses are required by CR 8(c) to be pleaded affirmatively. In light of that policy, federal courts have determined that the affirmative defense requirement is not absolute. Where a failure to plead a defense affirmatively does not affect the substantial rights of the parties, the noncompliance will be considered harmless. *Tillman v. National City Bank*, 118 F.2d 631, 635 (2d Cir. 1941) [*cert. denied*, 314 U.S. 650 (1941)]. Also, objection to a failure to comply with the rule is waived where there is written and oral argument to the court without objection on the legal issues raised in connection with the defense. *Joyce v. L. P. Steuart, Inc.*, 227 F.2d 407 (D.C. Cir. 1955). There is a need for such flexibility in procedural rules. In the present case, the record shows that a substantial portion of plaintiff's trial memorandum and the entire substance of the hearing on summary judgment concerned the effect of the liquidated damages clause. To conclude that defendants are precluded from relying upon that clause as a defense would be to impose a rigid and technical formality upon pleadings which is both unnecessary and contrary to the policy underlying CR 8(c), and we refuse to reach such a result.

*Mahoney v. Tingley*, 85 Wn.2d 95, 100-01, 529 P.2d 1068 (1975); *see Bernsen*, 68 Wn. App. at 434.

In the first trial, Dr. Brady gave his opinion that the in-

tubation likely caused Mr. Tyrrell's collapsed lungs. Mr. Henderson thus was aware at that time of at least the possibility the accident was not the sole cause of Mr. Tyrrell's injuries. Despite this knowledge, Mr. Henderson never formally raised the question of the hospital's fault, and discovery presumably proceeded for almost a year on the basis that, because the jury concluded Mr. Henderson was the driver, he was solely at fault.

Unlike the plaintiffs in *Mahoney* and *Bernsen*, Mr. Tyrrell did not litigate the case in a way that could be construed as a waiver of the affirmative defense requirement. The issue first arose during argument before the second trial on Mr. Tyrrell's motion to exclude evidence of the hospital's fault. Allowing Mr. Henderson to raise this new issue on the eve of the second trial would have required both parties to engage in substantial new discovery. In light of Mr. Henderson's awareness of the potential issue, and his failure to raise the question during the many months between the two trials, we conclude the trial court did not abuse its discretion in granting Mr. Tyrrell's pretrial motion in limine.[15]

A separate question is whether Mr. Tyrrell opened the door for evidence of the hospital's fault during the second trial by presenting Dr. Brady's opinion that there was no hospital negligence. As Mr. Henderson points out, the trial court, having previously excluded evidence of the hospital's fault, permitted Mr. Tyrrell to present evidence of the hospital's nonfault; then, the trial court refused to permit Mr. Henderson to rebut Dr. Brady's opinion with testimony from Dr. Appel.

▋ Given the court's earlier refusal to permit Mr. Henderson to raise the issue of hospital fault, Dr. Brady's opinion and the proffered testimony of Dr. Appel were ir-

---

[15]Mr. Henderson suggests it was unfair for Mr. Tyrrell to take the position in the first trial that hospital personnel *caused* Mr. Tyrrell's collapsed lung, and then to argue before the second trial for exclusion of evidence of the hospital's negligence. However, Mr. Tyrrell's position consistently has been that, while the intubation may have been an actual contributing cause of the injuries, the liability for the injuries rests with Mr. Henderson, who caused the accident.

relevant[16] to any question before the jury. However, Instruction 9 informed jurors that even negligent medical treatment is within the scope of risk created by the original negligent conduct. This instruction was a proper statement of the law. The jury is presumed to have followed the instruction. *Hizey v. Carpenter*, 119 Wn.2d 251, 269-70, 830 P.2d 646 (1992). Therefore, Dr. Brady's opinion was meaningless, and the error in admitting it was harmless.

The trial court, faced with a new and potentially time-consuming factual issue in the middle of trial, exercised its discretion by refusing Dr. Appel's irrelevant testimony. Under the peculiar circumstances of this case, we conclude there was no abuse of discretion.

Mr. Henderson also contends that, even if the factual questions were properly limited, the court erred in instructing the jury on intervening cause. The court provided two instructions on the issue; Instruction 8 provided:

> If you find that the sole proximate cause of an injury was a later independent intervening act of a person or entity not a party to this action that the Defendant, in the exercise of ordinary care could not reasonably have anticipated, the Defendant's original negligence is superseded by the intervening act and is not a proximate cause of the injury. If however, in the exercise of ordinary care, the Defendant should not reasonably have anticipated the intervening act it does not supersede the Defendant's original negligence and Defendant's negligence is a proximate cause.

> It is not necessary that the sequence of events or the particular resultant injury be foreseeable. It is only necessary that the resultant injury fall within the general field of danger which the Defendant should reasonably have anticipated.

> The Defendant has the burden to prove that a later independent intervening act was the sole proximate cause of an injury.

---

[16]Interestingly, Mr. Henderson's objection to Dr. Brady's opinion testimony was based not on its irrelevance, but on Dr. Brady's lack of qualifications on the standard of care in emergency rooms.

*See* WPI 12.05, at 130.

Instruction 9 provided:

> If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.
>
> Negligent or harmful medical treatment is within the scope of risk created by the original negligent conduct.

Mr. Henderson objected to Instruction 9 as repetitive of Instruction 8 and as a comment on the evidence.

Instruction 9 was based on *Lindquist v. Dengel*, 92 Wn.2d 257, 262, 595 P.2d 934 (1979); *see* RESTATEMENT (SECOND) OF TORTS § 457 (1965). Its language is taken directly from *Lindquist,* and is a correct statement of the law.[17] Mr. Henderson argues, however, that the instruction was a comment on the evidence that essentially directed a verdict against him. Mr. Henderson also argues Instruction 9 was not supported by the evidence, because there was no evidence of negligent or harmful treatment of Mr. Tyrrell.

But there *was* evidence of harmful treatment of Mr. Tyrrell; Dr. Brady testified specifically that the intubation likely was the cause of Mr. Tyrrell's collapsed lungs. If the jury was to be instructed *at all* on the issue of intervening cause, it had the right to know that, under Washington law, Mr. Henderson remained legally responsible for Mr. Tyrrell's injuries caused by the original negligent conduct.

The confusion regarding the court's instructions is a result of the trial court's attempt at fairness to Mr. Henderson. The court recognized that if the case had not been bifurcated, the jury would have heard Dr. Brady's opinion that the intubation caused the collapsed lungs. The court apparently concluded jurors were entitled to hear this evidence, even though negligent treatment does not negate the original actor's liability under Washington law. The

---

[17]We are aware of, but disagree with, a federal district court's conclusion that RCW 4.22.070 abrogated the common law *Lindquist* rule. *See Workman v. Chinchinian,* 807 F. Supp. 634, 643 (E.D. Wash. 1992).

court's error, then, was in submitting the issue of intervening cause to the jury at all. But the jury's verdict rendered the error harmless.

■■■ Mr. Henderson argues, essentially, that the trial court should have erred further by leaving open the possibility of hospital fault. However, as we have concluded above, Mr. Henderson failed to timely raise that issue. The trial court recognized this argument as an attempt to revive the fault issue, and appropriately rejected it. The error was in Mr. Henderson's favor, and he should not now be heard to complain the court did not err enough.

## V

### SIBLING'S ACHIEVEMENTS

A major area of dispute during the damages trial was Mr. Tyrrell's educational, intellectual, and employment potential before the accident.[18] Witnesses testified in detail about various factors they considered in making this prediction, including school evaluations from grade school, junior high school, high school and community college; and standardized tests performed in grade school and in the military.

Anthony Choppa, a rehabilitation counselor, testified "another piece of the puzzle" in determining a person's potential before an accident is a comparison of a sibling's academic accomplishments.[19] Mr. Choppa testified:

Back in the mid '80s, we had began [sic] getting requests to do assessments on children and young adults like this. And — we conducted a literature search. What is — what is out there? We wanted to know. And we wrote an article on that.

---

[18]Economists from both sides relied on this information to predict Mr. Tyrrell's future earnings. Both economists compared his earning potential if the accident had not occurred with his potential in light of the accident and his resulting injuries.

[19]Stacey Tyrrell, Mr. Tyrrell's younger brother, had earned an engineering degree from Arizona State University, and was employed at a yearly salary of $45,000.

And there were these longitudinal studies where they would follow people over time to see how things stacked up and there was a correlation found, in terms of predicting educational attainment in that regard. It was published in the Brookings Institute. And some university papers, as well. And so, there's a connection. As I said earlier, it's a piece — again another piece of the puzzle.

Economist Robert Moss agreed that comparison of parents' and siblings' education and earnings is "one indicator" in evaluating damages.

On the other hand, Dan McKinney, also a rehabilitation counselor, testified he was unaware of any literature that would support reliance on a sibling's achievements as a measure of success. Dr. Cripe, a clinical neuropsychologist, testified a sibling's behavior is a poor predictor of success or failure. And economist Lloyd Bassett testified he never relies on a sibling's accomplishments in calculating a person's earning potential.

Over objection, the trial court permitted this evidence on the basis of Mr. Choppa's opinion the evidence is helpful in predicting earning potential. The court indicated it would grant a cautionary instruction on the issue, but Mr. Henderson did not request one.

Mr. Henderson argues Mr. Choppa's opinion was inadmissible under ER 703, which provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

The focus of the rule is on the *reliability* of facts or data on which an expert relies. 3 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* ¶ 703[01] (1991) (hereafter Weinstein). The second sentence of the rule "recognizes that there may be facts which, although not possessing the degree of trustworthiness required by the

hearsay rule entitling them to consideration by the jury, are nevertheless sufficiently reliable for evaluation by an expert." Weinstein, *supra*, at 703-06.

Mr. Choppa' s opinion was based on the facts of Stacey Tyrrell's educational record and current salary, which were made known to him before the trial, as is permitted under ER 703. In addition, the facts of Stacey Tyrrell's achievements came before the jury in the form of direct testimony by Stacey Tyrrell. They are as reliable as any facts presented under those circumstances.

Mr. Henderson suggests, however, that the court should not have admitted Mr. Choppa's opinion because there was an insufficient showing that experts in the field generally agree on the use of comparisons among siblings. ER 703 "permits an opinion based on the expert's first-hand knowledge or on information generally relied on in the field of expertise." *Reese v. Stroh*, 128 Wn.2d 300, 309, 907 P.2d 282 (1995). Here, Mr. Choppa's opinion was based on first-hand knowledge, and was not inadmissible on that basis. ER 702 allows expert testimony if it will "assist the trier of fact to understand the evidence or to determine a fact in issue . . . ." Mr. Choppa explained his opinion and the facts on which it was based; the opinion was helpful to the jury in determining damages, and thus was admissible. Mr. Henderson cross-examined Mr. Choppa regarding his opinion, and presented evidence that sibling comparisons are not useful. The trial court did not abuse its discretion in allowing the testimony.

## VI

### REDUCTION OF DAMAGE AWARD

Finally, we consider whether the trial court erred in refusing to reduce the damage award. In *Bingaman v. Grays Harbor Community Hosp.*, 103 Wn.2d 831, 699 P.2d 1230 (1985), the Supreme Court reversed a Court of Appeals decision overturning a jury verdict as excessive. The court summarized the principles governing appellate review of jury awards:

The determination of the amount of damages, particularly in actions of this nature, is primarily and peculiarly within the province of the jury, under proper instructions, and the

courts should be and are reluctant to interfere with the conclusion of a jury when fairly made. ˙

If a jury's verdict is tainted by passion or prejudice, or is otherwise excessive, both the trial court and the appellate court have the power to reduce the award or order a new trial. Because of the favored position of the trial court, it is accorded room for the exercise of its sound discretion in such situations. The trial court sees and hears the witnesses, jurors, parties, counsel and bystanders; it can evaluate at first hand such things as candor, sincerity, demeanor, intelligence and any surrounding incidents. The appellate court, on the other hand, is tied to the written record and partly for that reason rarely exercises this power.

An appellate court will not disturb an award of damages made by a jury unless it is outside the range of substantial evidence in the record, or shocks the conscience of the court, or appears to˙have been arrived at as the result of passion or prejudice.

. . . .

Before passion or prejudice can justify reduction of a jury verdict, it must be of such manifest clarity as to make it unmistakable. This is not a case wherein the judgment of the jury has been so distorted by passion generated at trial that the court has the duty to substitute reason for retribution. Other than the amount of the verdict, the record in this case discloses nothing to suggest that the jury was prejudiced against the defendants or that it was incited by passion to regard the defense case unfairly.

The issue thus becomes whether the size of the award for pain and suffering in and of itself "shocks the conscience of the court.". Stated otherwise, were the damages flagrantly outrageous and extravagant? The facts as they pertain to the decedent's pain and suffering in this case were sufficiently impressive that the jury's award of damages for the decedent's pain and suffering did not shock the conscience of the trial court, nor do they shock the conscience of this court.

*Bingaman*, 103 Wn.2d at 835-37 (footnotes omitted); *see Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 268-69, 840 P.2d 860 (1992).

 In reviewing the amount of a jury award, it is improper for a court to compare it with verdicts in other cases. *Washburn*, 120 Wn.2d at 266-68. The jury's constitutional role in determining damages, particularly noneconomic damages, is essential. *Washburn*, 120 Wn.2d at 269 (citing *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 645-46, 771 P.2d 711, 780 P.2d 260 (1989)). Appellate review therefore is "most narrow and restrained — the appellate court 'rarely exercises this power.' " *Washburn*, 120 Wn.2d at 269 (quoting *Bingaman*, 103 Wn.2d at 835).

Mr. Henderson argues the jury's damage award in this case is flagrantly outrageous and extravagant. His brief points out the things Mr. Tyrrell *can* do despite his injuries. *See Washburn*, 120 Wn.2d at 269-70. However, Mr. Henderson downplays Mr. Tyrrell's unquestioned pain and suffering, as well as the serious and extensive injuries he sustained, many of which have continuing effects. There is nothing in the record to suggest the jury was prejudiced against Mr. Henderson or that it was incited by passion. Nor is the award so large as to shock the conscience of the court.

Mr. Henderson also argues Washington's limited scope of review of jury awards violated his right of due process. In *Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S. Ct. 2331, 129 L. Ed. 2d 336 (1994), the Supreme Court held the due process clause requires that a state permit judicial review of punitive damage awards. The Court thus invalidated Or. Const. art. VII, § 3, as construed by *Van Lom v. Schneiderman*, 187 Or. 89, 210 P.2d 461, 11 A.L.R.2d 1195 (1949), which barred judicial review of the amount of punitive damages. *Oberg*, 114 S. Ct. at 2341.

 The *Oberg* rule does not apply here for two reasons. First, the decision focused primarily on awards for punitive damages, which "pose an acute danger of arbitrary deprivation of property." *Id.* at 2340. The jury's award to Mr. Tyrrell did not include punitive damages. Second, as the Court noted in *Oberg*, all jurisdictions except Oregon permit judges to review the size of damage awards. *Id.* at

2338. As the Washington Supreme Court demonstrated in *Washburn*, 120 Wn.2d at 270-80, state law allows judicial review of damage awards.

The trial court did not err in denying Mr. Henderson's motion for reduction of the damage award.

We affirm.

SWEENEY, C.J., and MUNSON, J., concur.

After modification, further reconsideration denied March 14, 1996.