IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DARRYL NG-A-QUI, an individual,<br><br>          Appellant,<br><br>          v.<br><br>FLUKE CORPORATION, a<br>Washington profit corporation and<br>FORTIVE CORPORATION, a<br>Delaware corporation<br><br>          Respondent. | No. 83839-3-I<br><br>DIVISION ONE<br><br>ORDER WITHDRAWING AND<br>SUBSTITUTING OPINION |

The court has determined that the opinion in the above-entitled case filed on January 9, 2023 shall be withdrawn and a substitute opinion be filed. Now, therefore, it is hereby

ORDERED that the opinion filed on January 9, 2023 is withdrawn and a substitute opinion shall be filed.

FOR THE COURT:

_Chung, J._

_Díaz, J._          _Mann, J._

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| DARRYL NG-A-QUI, an individual<br><br>Appellant,<br><br>v.<br><br>FLUKE CORPORATION, a Washington profit corporation and FORTIVE CORPORATION, a Delaware corporation<br><br>Respondents. | No. 83839-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Darryl Ng-A-Qui filed this lawsuit against Fluke Corporation (Fluke), where he worked as an Environmental and Health Safety Specialist, claiming it terminated him in retaliation for reporting safety issues. Fluke moved for summary judgment, arguing it terminated Ng-A-Qui based on his subpar performance. The trial court granted Fluke's motion and dismissed Ng-A-Qui's claims of wrongful discharge in violation of public policy and retaliation and discrimination under the Washington Industrial Safety and Health Act, ch. 49.17 RCW. We affirm the trial court's order because Ng-A-Qui cannot meet his ultimate burden to show his protected activity was a substantial factor in Fluke's decision to terminate him.

<u>FACTS</u>

Fluke, a subsidiary of Fortive Corporation, manufactures test, measurement, and diagnostic equipment for industry. It operates three facilities in Everett, Washington: Fluke Park, Evergreen Way, and "Plastics." Fluke hired

Ng-A-Qui on May 5, 2014, as a Health and Safety Specialist Level IV at Fluke Park. The job description included identifying and monitoring safety issues; implementing safety plans; responding to regulatory authorities about hazardous supplies and wastes; and training Fluke employees.

Grace Giorgio supervised Ng-A-Qui nearly the whole time Fluke employed him until she left in mid-April 2019. Giorgio conducted all of Ng-A-Qui's annual performance reviews at Fluke. From 2014 through 2017, Ng-A-Qui's performance was rated "met most expectations" or higher. In 2014, Giorgio rated him a 3.15 (meets expectations) on Fluke's 5.0-point scale; in 2015, 2.6 (fully met expectations); in 2016, 2.2 (met most expectations); and in 2017, 2.8 (fully met expectations).[1]

Together, Ng-A-Qui and Giorgio urged management "that more eyes were needed" to identify safety issues. Although Fluke eventually provided him with a direct report, he was responsible for training the person, and Ng-A-Qui "became buried in work" because Fluke did not replace a colleague who left the company. Then, at the beginning of 2018, Ng-A-Qui's role expanded beyond Fluke Park so that he was also a resource to improve the safety program at Fluke's Evergreen Way facility. Around the same time, Giorgio told Ng-A-Qui he would be responsible for ensuring Fluke's compliance with an upcoming Department of Ecology (DOE) inspection for hazardous waste at Fluke Park.

---

[1] In the year of Ng-A-Qui's first review, 2014, the performance rating scale included these categories: unacceptable (1.0-1.4), below expectations (1.5-2.4), meets expectations (2.5-3.4), above expectations (3.5-4.4), and outstanding (4.5-5.0). Starting in 2015, the scale changed slightly to the following: did not meet expectations (1.0-1.4), met most expectations (1.5-2.4), fully met expectations (2.5-3.4), exceeded expectations (3.5-4.4), and significantly exceeded expectations (4.5-5.0).

After its inspection in May 2018, the DOE cited Fluke for over 30 violations of eight regulations. About five months after the inspection, Giorgio put Ng-A-Qui on a performance improvement program (PIP). The PIP began on October 3, 2018. It recited five "examples of not meeting expectations." The first example set out multiple issues relating to the DOE's inspection:

> Environmental Regulation Compliance
> - On March 22, 2018, you were notified by DOE that they would be inspecting our Fluke Park facility for compliance with RCRA rules
> - April 4, 2018, we had a meeting to discuss action you and Jon were to take to ensure compliance with those rules
> - May 22, 2018, DOE Inspectors arrive onsite had find [sic] several issues
> - July 12, 2018, NOTICE TO COMPLY was generated by DOE identifying 8 WACs that we were in violation with over 30 instances.
> - July 30, 2018, we developed a DOE Compliance Action Plan because there was little action taken to ensure corrective action to the identified items listed on the Notice to Comply
> - Of the 27 actions listed on the action plan, 11 were not completed per the due date.

The PIP contains four other examples of not meeting expectations: delinquent DOE fee notices, storm drains not cleaned, invoices not processed, and delinquent customer requests. The last paragraph of the PIP states:

> This plan remains in effect for up to the next 90 days. Immediate and sustained improvement is expected. If at any time during this period or thereafter you fail to meet your total job requirements, you are subject to further disciplinary action, up to and including termination, without additional warning. Nothing in this PIP alters Fluke at-will employment status.

Immediately below this paragraph, both Ng-A-Qui and his supervisor Giorgio signed.

After taking on his new responsibilities at Evergreen Way, Ng-A-Qui raised four safety concerns. Sometime in 2018, Ng-A-Qui informed Dan Munko, Fluke's Director of Operations at Evergreen Way, that some damaged storage racks at Evergreen Way needed replacement. Around October 2018, Ng-A-Qui told Munko about an ergonomic lifting hazard at Evergreen Way involving heavy wire spools. In the same month, Ng-A-Qui also told Munko that picker vehicles, tall forklifts used to move pallets around in the storage area, had knocked off "top ties"[2] at Evergreen Way; if dislodged, top ties could fall and harm employees. Finally, in January 2019, Fluke management asked Ng-A-Qui to research protective sleeves after molten plastic burned an employee, and he recommended sleeves that were heat-resistant, rather than only fire-resistant. Ng-A-Qui's PIP does not mention any of these specific safety concerns he had raised.[3]

Ng-A-Qui's PIP was scheduled to finish December 31, 2018. His supervisor Giorgio extended the PIP until January 31, 2019. Giorgio wanted additional time to receive feedback from employees who represented the "Voice of the Customer." Giorgio summarized the employee feedback as follows:

- Personable and professional, but seems to be in a rush, disorganized.
- He has not interacted well in group settings because he is a meticulous note taker which takes away from his verbal interactions.
- Need him to be a partner not a resource.
- Textbook responses and he lacks the creative options.

---

[2] Top ties are steel cross beams that are attached to the tops of pallet racks, cross the aisle, and then attach to the racks on the other side.

[3] The PIP began on October 3, 2018, before Ng-A-Qui's recommendation about the protective sleeves.

- Often working late hours, but his output on useful or helpful material is lacking.
- Does very little tactical work that I can see.
- He just never seems to have it together.

The extended PIP expired on Thursday, January 31, 2019. Ng-A-Qui's 2018 annual performance review occurred in the same time frame that Giorgio was assessing the PIP.[4] Ng-A-Qui received a review rating of 1.3 out of 5. The week after the PIP expired, on Wednesday, February 6, 2019, Giorgio wrote an email to Welden Howard in Fluke's Human Resources department regarding Ng-A-Qui's PIP, in which she listed the "5 element[s] for improvement . . . and the results." Giorgio concluded: "Based on this evaluation period's outcome, Darryl has not filled this role per expectation. I do not see Darryl being able to meet the requirements of this job."

Upon receipt of Giorgio's email assessing Ng-A-Qui's PIP, Howard requested approval to terminate Ng-A-Qui, first from his manager, Shannon Flynn, and then from Human Resources Vice President Anne Ensminger. In March, Giorgio informed her manager, Vice President Kristi Mosman, that she was leaving Fluke. Giorgio wanted to "wrap[] up" Ng-A-Qui's termination before she left Fluke, but that did not happen. Giorgio left when her replacement was in place in mid-April, and Mosman terminated Ng-A-Qui on May 30, 2019.

Ng-A-Qui filed a discrimination complaint with the Department of Labor and Industries (Department) on June 24, 2019. Ng-A-Qui told the Department: "I was terminated for trying to mitigate health and safety violations that were

---

[4] On March 8, 2019, Ng-A-Qui signed his 2018 annual performance review.

5

determined to be too expensive to correct." Where the form asked, "What may we expect your employer to tell us about you?" Ng-A-Qui wrote: "I had poor performance and had received numerous citations on a recent DOE Hazardous Waste Inspection." The Department responded on July 12, 2019, with a "non-merit determination," stating that his case "does not meet the criteria for further investigation because there was no engagement in a protected activity."

On August 9, 2019, Ng-A-Qui sued Fluke for wrongful discharge in violation of public policy, retaliation, and unlawful discrimination under the Washington Industrial Safety and Health Act (WISHA). On March 15, 2022, the court granted Fluke's motion for summary judgment and dismissed Ng-A-Qui's complaint. Ng-A-Qui appeals the dismissal.

## DISCUSSION

On appeal of an order granting summary judgment, we review de novo whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); see Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). When determining whether an issue of material fact exists, the reviewing court must construe all facts and inferences in favor of the nonmoving party. Id. at 552. A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation. Id.

WISHA's "retaliation statute," RCW 49.17.160,[5] "provides a remedy for employees who believe they have been discharged for reporting workplace safety concerns." Cudney v. ALSCO, Inc., 172 Wn.2d 524, 531, 259 P.3d 244 (2011), overruled on other grounds by Rose v. Anderson Hay & Grain Co., 184 Wn.2d 268, 358 P.3d 1139 (2015). The statute, however, is not the employee's exclusive remedy. Wilson v. City of Monroe, 88 Wn. App. 113, 126, 943 P.2d 1134 (1997). If an employer contravenes a clear mandate of public policy, Washington law recognizes the tort of wrongful discharge as an exception to the common law doctrine of at-will employment. Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 231-32, 685 P.2d 1081 (1984). Washington law generally limits this tort to four scenarios: an employee is fired for refusing to commit an illegal act; an employee is fired for performing a public act; an employee is fired for exercising a legal right; and an employee is fired in retaliation for reporting misconduct by the employer, i.e., whistle-blowing. Martin v. Gonzaga Univ., 191 Wn.2d 712, 723, 425 P.3d 837 (2018).

Courts use a burden-shifting framework for wrongful discharge as well as statutory employment retaliation and discrimination claims. See Cornwell v. Microsoft Corp., 192 Wn.2d 403, 411-12, 430 P.3d 229 (2018); see also Wilmot v. Kaiser Alum. & Chem. Corp., 118 Wn.2d 46,69, 821 P.2d 18 (1991) (courts apply burden-shifting framework to analyze wrongful discharge claims that fall into one of the four recognized scenarios). The burden of production initially rests

---

[5] Some provisions within RCW Chapter 49.17 were updated and reorganized effective July 1, 2022. Citations herein are to the versions applicable to this case, which were effective June 10, 2010, to June 30, 2022.

with the plaintiff employee to produce evidence of either a WISHA violation or a violation of a mandate of public policy. Wilmot, 118 Wn.2d at 67. Because employers are not apt to announce a retaliatory motive, a plaintiff usually shows the prima facie case with circumstantial evidence. Id. at 69. "The employee has the burden of establishing specific and material facts to support each element of his or her prima facie case." Hiatt v. Walker Chevrolet Co., 120 Wn.2d 57, 66, 837 P.2d 618 (1992) (emphasis in original).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer, who must articulate a legitimate, non-retaliatory reason for terminating the plaintiff. Wilmot, 118 Wn.2d at 68. This is a burden of production, not persuasion. Id. at 70. If the employer meets this burden, the burden shifts back to the plaintiff to show the employer's stated reason is pretextual or that even if the employer's reason is legitimate, the protected activity was nevertheless a substantial factor motivating the employer. Id. at 68, 72. At this point, the plaintiff's burden is persuasion by a preponderance of the evidence. Id. at 71, 73.

A. Ng-A-Qui's burden to establish a prima facie case

A plaintiff can satisfy the burden of production for a prima facie case of retaliation by showing (1) the plaintiff exercised or intended to exercise a right WISHA protects or a right legislatively or judicially recognized as protected by a mandate of public policy, (2) the employer terminated the plaintiff, and (3) a causal connection between exercising the right and termination. Wilmot, 118 Wn.2d at 68.

8

The parties do not dispute that Ng-A-Qui was terminated. However, Fluke argues that Ng-A-Qui failed to establish the first and third elements of his prima facie case. Drawing all inferences in favor of the nonmoving party, we determine that Ng-A-Qui met his minimal burden of production for his prima facie case.

1. Protected activity

A wrongful discharge claim requires establishing a clear mandate of public policy, which can be shown by prior judicial decisions or constitutional, statutory, or regulatory provisions or schemes. Martin, 191 Wn.2d at 725; RCW 49.17.010 (WISHA's purpose is to create, maintain, continue, and enhance industrial safety and health). Here, Ng-A-Qui's complaint alleges he "was retaliated against and subsequently terminated for reporting safety and health concerns to management." Thus, his wrongful discharge claim is based on public policy as established by WISHA, which is also the statutory basis for his retaliation claim.

WISHA states in relevant part:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or herself or others of any right afforded by this chapter. Prohibited discrimination includes an action that would deter a reasonable employee from exercising their rights under this chapter.

RCW 49.17.160(1) (emphasis supplied).[6] A plaintiff need not prove a WISHA violation in order to allege they were retaliated against for engaging in protected

---

[6] As a remedial statute, WISHA is liberally construed to carry out its purpose of providing safe working conditions for every Washington worker. Dep't of Labor & Indus. v. Tradesmen Int'l, 14 Wn. App. 2d 168, 175, 470 P.3d 519 (2020) (citations omitted), aff'd, 198 Wn.2d 524 (2020).

activity. <u>Ellis v. City of Seattle</u>, 142 Wn.2d 450, 461, 13 P.3d 1065 (2000) ("In the retaliatory discharge context, Washington law has recognized a cause of action where an employee has an objectively reasonable belief an employer has violated the law."); <u>see also</u> <u>Wilson</u>, 88 Wn. App. at 123-27 (holding a violation of WISHA is not mandatory for a claim of wrongful discharge in violation of public policy).

The record contains evidence that Ng-A-Qui reported safety concerns to Fluke's management team at Evergreen Way: in 2018, that storage racks were warped and not seismically fit; around October 2018, that heavy wire spools were an ergonomic lifting hazard; also around October 2018, that top ties used to stabilize pallet racks had been knocked off and could fall on workers; and in January 2019, that heat-resistant protective sleeves were needed to protect employees from molten plastic. Thus, Ng-A-Qui met his minimal burden of production to establish he engaged in a protected activity because the undisputed record shows that he reported safety concerns to Fluke's management.[7]

### 2. Causation

An employee can establish the element of causation for the prima facie case by showing that retaliation was a substantial factor motivating the adverse

---

[7] We reject Fluke's invitation to interpret WISHA to preclude employees from bringing retaliation claims unless they "step outside" their job duties. WISHA protects "any employee" who engages in one of three distinct types of activity: (1) "filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter"; (2) "testified or is about to testify in any such proceeding"; or (3) "because of the exercise by such employee on behalf of himself or herself or others of any right afforded by this chapter." RCW 49.17.160(1). "Any employee" is unambiguous and does not exclude any class of workers based on their role. Therefore, there is no basis in the plain language of WISHA to support the interpretation Fluke urges.

action. Cornwell, 192 Wn.2d at 412. An employee may show this with evidence that (1) the employee took a protected action, (2) the employer had knowledge of the action, and (3) the employee was subjected to an adverse employment action. Id. at 413.[8]

Here, as discussed above, Ng-A-Qui engaged in a protected activity by raising safety concerns, and he was terminated. To satisfy the prima facie element of causation, he must also establish that his employer knew of the protected actions.

An employer has the requisite knowledge if they had actual knowledge or if the employer "knew or suspected"[9] the employee engaged in protected action. Cornwell, 192 Wn.2d at 413, 417. Actual knowledge of the employee's protected activity is necessary because retaliation is an intentional act; however, a decision-maker need not have knowledge that the action was legally protected, but rather, only that the employee took the action. Id. at 414.

Here, Ng-A-Qui's supervisor Giorgio was the person who recommended his termination, even though she left Fluke before that decision was implemented. Others at Fluke, including its HR department and its managers Mosman and Ensminger, relied on her recommendation, her assessment of his

---

[8] Alternatively, a plaintiff can demonstrate a causal connection circumstantially through proximity in time between the protected activity and termination, "coupled with evidence of satisfactory work performance and supervisory evaluations." Wilmot, 118 Wn.2d at 69. We need not examine this test here because Ng-A-Qui can establish the causation element for the prima facie case using the alternative method discussed in Cornwell, 192 Wn.2d at 412-13.

[9] "The 'knew or suspected' standard incorporates the actual knowledge standard and also encompasses cases in which the employer suspects that an employee engaged in protected action." Cornwell, 192 Wn.2d at 417. It applies, for example, when a supervisor has actual knowledge that a protected complaint was made, but only a suspicion about who made the complaint, and then takes an adverse action based on that suspicion. Id.

PIP, and her rating of his 2018 performance. It is also undisputed that Giorgio had actual knowledge of at least some of Ng-A-Qui's protected activity. Therefore, Ng-A-Qui can establish a prima facie case regarding causation because there is evidence he engaged in protected activity about which his supervisor Giorgio had actual knowledge, and he was later subjected to an adverse employment action, termination.

B. Fluke's burden to show a legitimate, non-retaliatory reason for termination

Ng-A-Qui having met his prima facie burden, the burden shifts to the employer, Fluke, which must articulate a legitimate, non-retaliatory reason for terminating the employee. Wilmot, 118 Wn.2d at 68. The burden is one of production, not persuasion. Id. at 68.

Fluke claims it terminated Ng-A-Qui pursuant to Giorgio's recommendation, which was based on his unsuccessful PIP and his unsatisfactory 2018 annual performance review. The October 2018 PIP initiation letter enumerated five areas in which Fluke expected "immediate and sustained improvement" by Ng-A-Qui. In a subsequent email to Fluke HR representative Howard dated February 6, 2019, Giorgio assessed "the results" of the PIP.

The first area for improvement in the PIP plan was to "ensure 100% compliance with regulatory requirements at [Evergreen Way] and all [of] Everett." Giorgio's email to Howard states "Darryl was late for all of the following" and then lists three inspections, an audit, "audiograms," and "Safety Committee meetings."

Second, Ng-A-Qui was to integrate safety policies at Evergreen Way. However, Giorgio's email states "Darryl did not meet [management's]

expectations. He did not integrate himself well. . . .There was a lack of collaboration . . . and failed communication opportunities."

The third area was collaboration with Evergreen Way management. While Evergreen Way gave Ng-A-Qui access to their strategic process, Giorgio wrote that "in that meeting, Darryl was 'on his computer and was not participating in the group discussion' which impacts his effectiveness as [a safety] leader."

The fourth area was improved interactions with internal customers. Giorgio asked 12 of Darryl's fellow employees for feedback as the "Voice of the Customer." Seven responded, and Giorgio summarized the results as follows:

- personable and professional but seems to be in rush, disorganized. He has not interacted well in group setting because he is a meticulous note taker which takes away from his verbal interactions.
- "need him to be a partner not a resource"
- "textbook responses and he lack [sic] the creative options"
- "often working late hours, but his output on useful or helpful material is lacking"
- "Does very little tactical work that I can see. He just never seems to have it together."

The final area for assessment was a training matrix Ng-A-Qui was to develop and complete. Giorgio's assessment was that the assignment was due November 12, 2018, and "this was still not completed by January 25, 2019."

During the same time period that Giorgio assessed Ng-A-Qui's PIP performance, the two conducted his 2018 annual performance review, which was completed and signed on March 8, 2019. He received an overall rating of 1.3 out of 5 – did not meet expectations.

Ng-A-Qui's 2018 performance appraisal contained a section on three performance objectives—compliance, performance, engagement—and an

assessment of nine "leadership competencies." Regarding the objective of compliance, Ng-A-Qui wrote "[o]n time completion and just completion . . . was a struggle this year." He added that "[a]lthough [Fluke] (luckily) escaped serious punitive measures from any regulatory agencies I fell far short of many deadlines . . . ." Giorgio said, "Darryl did not complete all tasks in compliance with the Compliance Calendar and in a number of cases did not complete them within regulatory compliance."

Regarding the second objective, performance at Evergreen Way and Plastics, Ng-A-Qui wrote: "This Performance Objective fell just short of abject failure as well with very little progress being made." Giorgio wrote: "Darryl did not complete the objectives given," and she cited examples that were not completed despite Fluke "h[olding] off the audit to give Darryl more time." Finally, regarding the third objective, engagement, Ng-A-Qui was "unsure how this turned out," and Giorgio removed this section from the review as she had not received "the numbers."

For the portion of the review assessing leadership competencies,[10] six of Ng-A-Qui's ratings were "1 - Did Not Meet Expectations" and three were "2 - Met Most Expectations." Ng-A-Qui wrote in his "Key Takeaways" section, "This year could be called a 'learning experience' at best and was very disappointing in what I had hoped to accomplish and what was actually accomplished." In the manager's "Key Takeaways" section, Giorgio wrote: "This year was an

---

[10] The nine leadership competencies were Customer Obsessed, Strategic, Innovate for impact, Inspiring, Build extraordinary teams, Courageous, Deliver results, Adaptable, Lead with FBS.

opportunity for Darryl. He was given EHS leadership for two locations. He struggled to get buy-in with [leaders at Evergreen Way] which derailed him [sic] meeting he [sic] goals in this area. He also did not meet the expectations of ensuring that we stayed in compliance with our regulatory obligations that he was responsible for."

Giorgio ended her February email to Howard by recommending that Fluke terminate Ng-A-Qui: "Based on this evaluation period's outcome, Darryl has not filled this role per expectation. I do not see Darryl being able to meet the requirements of this job."

Fluke produced evidence that it terminated Ng-A-Qui based on Giorgio's recommendation after she assessed his performance under the PIP and for his 2018 performance review. Therefore, Fluke met its burden to produce evidence of a legitimate, non-retaliatory reason for terminating Ng-A-Qui.

### C. Ng-A-Qui's burden to show pretext or that retaliation was a substantial factor

At this final step, the plaintiff has the burden of persuasion to prove either that the employer's reason is pretextual or that, although the employer's stated reason is legitimate, the protected activity was nevertheless a substantial factor motivating the employer to terminate the employee. Martin, 191 Wn.2d at 726 (citing Wilmot, 118 Wn.2d at 73).

Ng-A-Qui claims Fluke's asserted reason for terminating him, poor performance as evidenced by the failed PIP and the 2018 evaluation, is pretext because "Ms. Giorgio took Mr. Ng-A-Qui off the PIP"; in other words, Giorgio did not tell him that he failed the PIP or that the PIP was extended. But the evidence

is to the contrary. The record shows Giorgio extended the PIP from its original end date of December 31, 2018, to January 31, 2019, told Ng-A-Qui on December 28, 2018, that the PIP was extended, and informed Fluke HR that Ng-A-Qui failed the PIP. Even if Giorgio did not communicate to Ng-A-Qui her assessment that he did not satisfy his PIP, reasonable minds cannot differ that the PIP was extended and that Giorgio communicated the extension to Ng-A-Qui.

Ng-A-Qui asserts that if he had failed the PIP, he would have been terminated at that time. The record shows that Giorgio recommended his termination to HR in February, after completing the PIP assessment and filling out her portion of the performance review,[11] and she left Fluke in mid-April 2019. Fluke terminated Ng-A-Qui on May 30, 2019. The delay between the end of his PIP and his termination was caused by Giorgio's departure and the need to arrange for her replacement. Reasonable minds cannot differ that the delay was caused by internal processes and Giorgio leaving Fluke and that the delay does not establish that Ng-A-Qui had satisfied his PIP.

In the absence of evidence of pretext, a plaintiff may still meet their burden of proof by showing that their protected activity was a substantial factor in the termination decision. <u>Martin</u>, 191 Wn.2d at 726 (citing <u>Wilmot</u>, 118 Wn.2d at 73). Ng-A-Qui asserts Munko, the director of operations at Evergreen Way to whom he had raised safety concerns, "caused the PIP to be implemented to provide cover for his retaliation" about the safety concerns.

---

[11] Although Giorgio's February 2019 email states that "Darryl's PA score was 1.3 by his manager," indicating she had completed her portion of the review, Ng-A-Qui did not sign the acknowledgment that he had "read the performance appraisal form and a performance discussion has occurred" until March 8, 2019.

However, in his deposition, when Ng-A-Qui was asked "[d]id [Giorgio] ever tell you that she was being directed to an end?" Ng-A-Qui answered, "No. Not that I remember, no." Asked "Do you believe that Dan [Munko], Dale [Goyer], and Kristi [Mosman] directed Grace [Giorgio] to an end, to use your term," Ng-A-Qui answered, "I do. If not, I wouldn't . . . . I don't know about all of them, but at least one of them."

Ng-A-Qui's conclusory statements, without more, are insufficient to satisfy his burden of persuasion. Other than Ng-A-Qui's belief that someone—perhaps Munko—directed Giorgio to institute the PIP based on safety concerns Ng-A-Qui raised, the only evidence connecting Munko to Ng-A-Qui's termination is that Munko was one of seven employees who provided "Voice of the Customer" input at Giorgio's request for Ng-A-Qui's PIP. But Munko's feedback focused on delegation skills and integrating with the operations leadership team at Evergreen Way. The PIP was based on deficiencies related to the DOE inspection; the PIP contains no reference at all to the safety concerns Ng-A-Qui expressed to Munko.

While Ng-A-Qui can establish a prima facie case, he cannot meet his burden of persuasion to show Fluke's reason for terminating him was pretextual or that his protected activity, reporting safety concerns, nevertheless was a substantial factor in Fluke's decision to terminate him. Therefore, the trial court properly granted Fluke's motion for summary judgment.

D. Spoliation

In the alternative, Ng-A-Qui argues that the trial court erred because spoliation by Fluke should have resulted in an adverse inference that would have defeated summary judgment. Fluke argues there was no spoliation, and if there was, it was not intentional, so no adverse inference was due. We agree with Fluke.

Spoliation is "[t]he intentional destruction of evidence." Henderson v. Tyrrell, 80 Wn. App. 592, 605, 910 P.2d 522 (1996) (citing BLACK'S LAW DICTIONARY 1401 (6th ed. 1990)). Whether the remedy is an adverse inference, a rebuttable presumption, or civil discovery sanction, the spoliation must in some way be connected to the party against whom the remedy is applied. Id. at 605-06.

In deciding whether to apply a remedy, courts examine two factors: (1) the potential importance or relevance of the missing evidence; and (2) the culpability or fault of the adverse party. Id. at 607 (citing Sweet v. Sisters of Providence, 895 P.2d 484, 490-91 (Alaska 1995)). Whether missing evidence is important or relevant depends on the case, and an important consideration is whether a party gained an advantage. Henderson, 80 Wn. App. at 607 (citations omitted). Courts examine whether the party acted in bad faith or conscious disregard of the importance of the evidence, or whether there was some innocent explanation, to determine culpability. Id. at 609 (citations omitted). "Merely negligent destruction of evidence cannot support an adverse inference." Cook v. Tarbert Logging, 190 Wn. App. 448, 469-70, 360 P.3d 855 (2015). Sanctions for discovery violations

18

and the admission or rejection of evidence are reviewed for abuse of discretion. Henderson, 80 Wn. App. at 604.

Ng-A-Qui states that during his employment, he kept detailed notes and photographs about safety concerns in OneNote, a program on his Fluke laptop. He alleges these notes are a "smoking gun" because they document every safety concern he raised and "show the communication between myself and other experts in the company to prove that I made the safety reports . . . [and] they were legitimate and well documented . . . ."[12]

Here, the OneNote files are relevant and may have been helpful to Ng-A-Qui because any evidence Fluke violated a protected right contributes to his prima facie burden of production. However, as to the second factor for spoliation, culpability, the record shows Fluke did not destroy evidence. On May 30, 2019, Mosman sent a request to Fluke's service desk stating she "[n]eed[ed] data off of [Ng-A-Qui's] computer." The following week, on June 5, 2019, the service desk closed the request with the note, "Retrieved personal files for Darryl and [] hand delivered on flash drive."

While the OneNote files were relevant and may have been helpful, the record shows Fluke preserved those files, and Ng-A-Qui assigns no error to any trial court ruling about this evidence.[13] Ng-A-Qui was not due an adverse

---

[12] Ng-A-Qui conceded at oral argument that at most, his OneNote files would provide evidence only of a protected activity. Wash. Court of Appeals oral argument, Ng-A-Qui v. Fluke Corp and Fortive Corp., No. 83839-3-I (Oct. 26, 2022) at 21 mins.,15 sec., video recorded by TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID =2022101174.

[13] Ng-A-Qui assigns error solely to the trial court's grant of summary judgment. Below, Ng-A-Qui's motion in opposition to summary judgment does not use the term "spoliation" but alleged Fluke "either deleted the information or withheld it from discovery." (emphasis added). He assigns no error to any trial court decision regarding this evidence, whether a discovery motion or

inference for spoliation. Also, by Ng-A-Qui's own admission, any inference would have shown only that he engaged in protected activity, and there was already evidence of this in the record. The trial court did not abuse its discretion in denying such an inference.

## CONCLUSION

We affirm the trial court's order granting summary judgment to Fluke dismissing Ng-A-Qui's claims for wrongful discharge in violation of public policy and retaliation and unlawful discrimination under WISHA. Ng-A-Qui established his prima facie case, but Fluke produced evidence of a legitimate, non-retaliatory reason for his discharge, and Ng-A-Qui cannot meet his ultimate burden to show Fluke's reason was pretextual or a protected activity was nevertheless a substantial factor in the decision to terminate him. As there is no genuine issue as to any material fact, summary judgment dismissal was proper.

Affirmed.

_Chung, J._

WE CONCUR:

_Díaz, J._                              _Mann, J._

---

motion for sanctions. An appellate court "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a); Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005).